UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL COMPLAINT |
| v. | : | Mag. No. 19-8167 (LDW) |
| JOHN C. DEVLIN, a/k/a "Jack Devlin" | : | |

I, Mark Brzyzek, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this Complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

Mark Brzyzek
Mark Brzyzek, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
June 21, 2019, in Newark, New Jersey

Leda D. Wettre
THE HONORABLE LEDA DUNN WETTRE
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

From at least as early as in or around December 2015 through in or around October 2018, in the District of New Jersey, and elsewhere, defendant

**JOHN C. DEVLIN**
**a/k/a "Jack Devlin"**

did knowingly and intentionally conspire with others to knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program, as defined under Title 18, United States Code, Section 24(b), and to obtain, by means of false and fraudulent pretenses, representations, and promises, any money and property owned by, and under the custody and control of, any health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

In violation of Title 18, United States Code, Section 1349.

**ATTACHMENT B**

I, Mark Brzyzek, am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have knowledge of the facts set forth herein based on my own investigation, my conversations with other law enforcement officers and others, and my review of reports, documents, and other evidence. Because this Complaint is being submitted for a limited purpose, I have not set forth every fact that I know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged. Statements attributed to individuals are provided in substance and in part. Furthermore, explanations in parentheses are based upon my knowledge and experience, the knowledge, training, and experience of law enforcement agents and officers with whom I have spoken, and the results of the investigation to date.

1. At all times relevant to this Complaint:

a. Defendant John C. Devlin, a/k/a "Jack Devlin" ("DEVLIN") resided in Los Angeles, California.

b. Weston Recovery Solutions LLC ("WESTON") was a marketing company incorporated in California. WESTON was owned in part by DEVLIN.

c. "Co-conspirator-1" resided in Forest Hill, Maryland and was a partner in WESTON. Co-conspirator-1 is not charged in this Complaint.

d. "Recruiter-1" resided in Red Bank, New Jersey.

e. "Patient-1" resided in Fanwood, New Jersey and was suffering from heroin addiction.

f. "Patient-2" resided in Red Bank, New Jersey and was suffering from heroin addiction. Patient-2 maintained health insurance through "Patient-2's Health Insurance," a private insurer that was a health care benefit program as defined under 18 U.S.C. § 24(b).

**Federal Guidelines for Substance Abuse Treatment**

2. The U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA") was tasked with establishing and implementing a comprehensive program to improve treatment and related services to

individuals concerning substance abuse and protecting the rights of substance abusers. 42 U.S.C. § 290aa.

3. "Substance abuse" was generally defined as the abuse of alcohol or other drugs. "Treatment" meant the "care of a patient suffering from a substance use disorder, a condition which is identified as having been caused by the substance abuse disorder, or both, in order to reduce or eliminate the adverse effects upon the patient." 42 C.F.R. § 2.11.

4. Substance abuse treatment facilities provided services to assist patients in overcoming their addictions. There were varying levels of treatment, including Detoxification Services ("Detox"), Partial Hospitalization Programs ("PHPs"), Intensive Outpatient Programs ("IOPs") and Outpatient Programs ("OPs"). Services and testing at Detox centers, PHPs, IOPs, or OPs could be billed to health care benefit programs when they were medically necessary and provided by, or overseen by, licensed medical professionals.

5. Insurance coverage for substance abuse treatment and testing was available through health plans offered directly by private insurance companies, in addition to government-funded insurance providers. The private health insurance providers were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b); that is, "public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual."

## Overview of the Conspiracy

6. In or around July 2018, the FBI began investigating defendant DEVLIN, and others, for conspiring to commit health care fraud.

7. Based on information obtained from lawfully intercepted conversations, search warrants, physical surveillance, GPS trackers, searches of law enforcement databases, interviews of witnesses, bank records, phone records, health insurance records, and other investigative techniques, the investigation has revealed that DEVLIN conspired to commit health care fraud by orchestrating a scheme with others that worked as follows:

a. DEVLIN owned and operated WESTON, a marketing company that maintained contractual relationships with substance abuse treatment facilities around the country (predominantly in California), including Detox Centers, PHPs, IOPs, and OPs (the "Facilities").

b. The contracts between WESTON and the Facilities called for the payment of fees from the Facilities to WESTON based on several factors,

including: (i) the number of individuals referred by WESTON or WESTON-affiliated recruiters; (ii) the duration of the individuals' stay in the Facility; (iii) the level of purported treatment received at the Facility; and (iv) the type of coverage provided by the individuals' health insurances.

c. WESTON engaged a nationwide network of recruiters (the "Recruiters"), including Recruiter-1, who were instructed by DEVLIN to identify drug-addicted individuals who: (i) were covered under a health care benefit program, as defined under 18 U.S.C. § 24(b); and (ii) were addicted to heroin or another drug (the "Patients").

d. DEVLIN knew that, in order to convince the Patients to travel to and enroll in the Facilities when they otherwise would not have, WESTON's recruiters, including Recruiter-1, on numerous occasions offered to bribe the Patients (the "Patient Bribes"). The Patient Bribes often were several thousand dollars.

e. DEVLIN also knew that WESTON and the Recruiters directed Patients to Facilities that WESTON had contractual relationships with. This was so even though some Facilities provided ineffective drug treatment or, in some cases, actually fostered drug use instead of drug treatment.

f. Once the Patients enrolled at a Facility, the scheme required that the Patient remain there for at least 10 days—regardless of the quality of care—because that time period ensured that the Facility generated sufficient billing to the Patient's health care benefit program such that the Facility could profitably pay a referral payment to WESTON (the "Referral Payment"). Facilities paid WESTON larger Referral Payments the longer the Patient remained at the Facility after 10 days.

g. The amount of the Referral Payment from the Facilities to WESTON varied depending on several factors including: how long the Patients remained at the Facilities; the level of purported treatment; and the Patients' health insurance coverage. Typically, the Referral Payment was between approximately $5,000 and $10,000 per Patient.

h. At the direction of DEVLIN, WESTON in turn paid a percentage of the Referral Payment to the Recruiter who had initially recruited the Patient, which was approximately 50% of the Referral Payment.

i. WESTON and the Recruiters often directed Patients to different Facilities month after month to generate multiple Referral Payments without regard to whether the substance abuse treatment was medically necessary or effective. For example, in a conversation over Facebook that was

intercepted by law enforcement, Patient-1 told Recruiter-1 that if Recruiter-1 made good on Recruiter-1's promise to pay Patient-1 a Patient Bribe, Patient-1 would enroll in additional Facilities to trigger additional Referral Payments and Patient Bribes: "[J]ust get us [sic] grab the dough and put us in another place. . . . Get paid some more feel me. . . . I'll keep this up all year wit[h] you. As long as you do us right."

8. Throughout the conspiracy, DEVLIN and his co-conspirators on average brokered several dozen Patients per month to the Facilities regardless of whether the Patients were genuinely seeking substance abuse treatment. In doing so, DEVLIN and his co-conspirators earned as much as hundreds of thousands of dollars per month in Referral Payments.

**Representative Example of the Fraudulent Scheme**

9. In or around March 2018, Recruiter-1 and Patient-2 agreed that Recruiter-1 would pay Patient-2 a Patient Bribe if Patient-2 enrolled at a Facility that had a contractual relationship with WESTON.

10. According to WESTON's internal accounting records, which were lawfully obtained by law enforcement, Recruiter-1, on behalf of WESTON, had previously recruited Patient-2 to enroll in three different Facilities in the three prior months, from in or around December 2017 through in or around February 2018. According to health insurance billing records obtained by law enforcement, those three Facilities billed health care benefit programs over $50,000 for Patient-2's stays. In each of those instances: Recruiter-1 had promised Patient-2 a Patient Bribe; WESTON had billed the Facilities for Referral Payments associated with Patient-2's enrollment; and Recruiter-1 was owed a percentage of the Referral Payment for recruiting Patient-2 to the Facility.

11. Despite trips to Facilities in the three previous months, on or about March 9, 2018, based on the agreement with Recruiter-1, Patient-2 traveled from New Jersey to a Detox Facility in California ("Facility-1"). WESTON bought Patient-2's plane ticket, and Patient-2 remained at Facility-1 for approximately 10 days.

12. Based on billing records obtained by law enforcement, Facility-1 billed Patient-2's Health Insurance approximately $46,055.00 for the 10-day stay. Facility-1 also paid WESTON a Referral Payment for Patient-2. WESTON owed Recruiter-1 a percentage of the Referral Payment, but, in this instance, WESTON never paid Recruiter-1.

13. Then, on or about March 19, 2018, WESTON and Recruiter-1 sent Patient-2 to another Facility in California ("Facility-2") that provided PHP and IOP services. On the same day, Patient-2 reported to Recruiter-1 that "everyone's high" in Facility-2 and that "it's a flop." (Patient-2 was informing Recruiter-1 that Facility-2 was a "drug house" ("flop") rather than a legitimate substance abuse treatment facility.) Recruiter-1 in turn relayed that information to DEVLIN in a text message conversation, and DEVLIN responded, "Lol." (Devlin was "laughing out loud" at Recruiter-1's report that Facility-2 was a sham.)

14. Approximately six days later, on or about March 25, 2018, Co-conspirator-1 reported via text message to DEVLIN and Recruiter-1 that Patient-2 was "smoking meth" at Facility-2. (Co-conspirator-1 was referring to methamphetamine.) Recruiter-1 replied, "Yes. [Patient-2]'s freaking out at me.. [Patient-2] said out of the 10 ppl. in [Facility-2] only 4 are sober. The rest are smoking meth and dope bc [Patient-2] said the[y] have unsupervised urines. [Patient-2] said everyone's high and it's a complete flop and [Patient-2] tried to stay sober around it without 'ratting' as long as he could." (Recruiter-1 was telling DEVLIN and Co-conspirator-1 that, despite the dangerous environment in which Patient-2 had relapsed, Patient-2 was trying to remain at Facility-2 long enough ("without 'ratting'") to trigger Referral Payments to WESTON, which would increase the likelihood that Patient-2 would receive the Patient Bribe that Recruiter-1 had promised.)

15. The next day, on or about March 26, 2018, WESTON was told that Patient-2's Health Insurance denied authorization for reimbursements for Patient-2's stay at Facility-2. In a text message conversation intercepted by law enforcement between DEVLIN, Co-conspirator-1, and Recruiter-1, Recruiter-1 lamented that because Patient-2 did not stay the required 10 days at Facility-2, Recruiter-1 would not receive a percentage of the Referral Payment. Co-conspirator-1 responded, "Yep I know. When they [sic] insurance is done they're done." DEVLIN then stated, "Ain't nothing you can do when an insurance company says fuck you lol[.] At least we didn't find out in the tenth billable day." Patient-2 left Facility-2 soon after.

16. Based on billing information obtained by law enforcement from Patient-2's Health Insurance, Facility-2 billed Patient-2's Health Insurance approximately $17,850 for Patient-2's stay at Facility-2.

## DEVLIN's Knowledge of the Fraudulent Scheme

17. To conceal the fraudulent scheme, DEVLIN discouraged discussion over text message among his co-conspirators and the Recruiters of any Referral Payments or Patient Bribes. Instead, DEVLIN often insisted on using encrypted cellular telephone applications, including Signal, to communicate with his co-conspirators and the Recruiters. For example, on or about June 22, 2018, when DEVLIN was discussing the scheme with Recruiter-1, DEVLIN stated, "Signal forever man. I don't want anything abou[t] payments . . . or anything else on here." (DEVLIN was telling Recruiter-1 to always discuss the fraudulent scheme over Signal, an encrypted messaging application, which would hinder detection and prosecution.)

18. Even during discussions on encrypted applications like Signal, DEVLIN sought to limit discussion about the fraudulent scheme. For example, during a discussion between DEVLIN and Recruiter-1 over Signal on or about June 29, 2018 in which they were discussing the scheme, Recruiter-1 alluded to paying a Patient. DEVLIN wrote, "That means you will be paying the [Patient]." Recruiter-1 responded, "Yes." DEVLIN then admonished Recruiter-1: "Bro you can't send me that shit man." Recruiter-1 replied, "It's on signal[,] thought we were good. Sorry." (Recruiter-1 was apologizing for discussing paying Patients and explaining to DEVLIN that Recruiter-1 believed it was safe to do so because they were communicating over an encrypted application ("It's on signal").) DEVLIN then immediately reset his Signal timer to ensure that all future messages between DEVLIN and Recruiter-1 would be automatically deleted from both DEVLIN's and Recruiter-1's cellular telephones within 10 seconds after they were read.

19. Separately, during a discussion between DEVLIN and Recruiter-1 in or around March 2019 that was lawfully intercepted by law enforcement, DEVLIN acknowledged that the scheme "was all shady. . . . [I]t was all dishonest." When Recruiter-1 stated that "paying clients" "bother[ed]" him, referring to the Patient Bribes, DEVLIN responded, "Yeah." Later during the same conversation, DEVLIN described the scheme as follows: "You place clients and get paid. And you get paid when they stay a certain amount of time and that's it."